UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

06 Cr. 902 (RWS)
S1 06 Cr. 902 (RWS)

   - against -

SENTENCING OPINION

ROBERT KOCH

                Defendant.

------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6|4|12

**Sweet, D.J.**


       On September 29, 2006, Robert Koch ("Koch" or the
"Defendant") pleaded guilty to two counts of conspiracy to
commit securities, mail and wire fraud, in violation of 18
U.S.C. § 371, and one count of committing securities fraud, in
violation of 15 U.S.C. §§ 78j(b) and 78ff.  On August 23, 2011,
Koch pleaded guilty to two counts of conspiracy to commit
securities, mail and wire fraud, in violation of 18 U.S.C. §
371, and one count of securities fraud, in violation of 15
U.S.C. §§ 78j(b) and 78ff.  For the reasons set forth below,
Koch will be sentenced to 78 months' imprisonment to be followed
by three years' supervised release.  Koch will forfeit to the

1

United States all property real and personal, involved in the offense or traceable to such property, including but not limited to a sum of money equal to $350,000 for offenses alleged in Information 06 CR 902, and all property real and personal, involved in the offense or traceable to such property including but not limited to a sum of money equal to $511,759 for offenses alleged in Information S1 06 CR 902. Koch will be required to pay a special assessment of $600.

## Prior Proceedings

On September 29, 2006, three-count Information 06 CR 902 (RWS) was filed in the Southern District of New York.

Count 1 charges that from October 2004 through April 2005, in the Southern District of New York, and elsewhere, Koch and others known and unknown conspired to commit offense against the United States, to wit: (1) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5; (2) mail fraud, in violation of 18 U.S.C. § 1341; and (3) wire fraud, in violation of 18 U.S.C. § 1343.

Count 2 charges that from about October 2004 throught at least April 2005, Koch, Robert McAllister ("McAllister") and others known and unknown, directly and indirectly, by the use of means of interstate commerce, the mails, and the facilities of national securities exchanges, did us and employ in connection with the purchase and sale of securities, manipulative and deceptive devices, in violation of 17 C.F.R. § 240.10b-5, by: (2) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of Millennium securities.

Count 3 charges that charges that from about 2002 through about 2004, in the Southern District of New York and elsewhere, Koch and others known and unknown, conspired together and with each other to commit offenses against the United States, to wit: (1) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 and (2) wire fraud, in violation of 18 U.S.C. § 1343.

3

On September 29, 2006, Koch appeared before the Honorable Henry B. Pitman in the Southern District and pleaded guilty to Counts 1, 2 and 3. The plea was later accepted by the Honorable Robert W. Sweet in the Southern District on October 6, 2006.

On August 23, 2011, three-count Information S1 06 CR 902 (RWS) was filed in the Southern District of New York.

Count 1 charges that from October 2006 through July 2008, in the Southern District of New York and elsewhere, Koch and others known and unknown, willfully and knowingly conspired to commit offenses against the United States, to wit: (1) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5; (2) mail fraud, in violation of 18 U.S.C. § 1341; and (3) wire fraud, in violation of 18 U.S.C. § 1343.

Count 2 charges that from about October 2006 through July 2008, Koch, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of means of interstate commerce, the mails, and the facilities of national

4

securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of 17 U.S.C. §240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of Inca securities.

Count 3 charges that from October 2006 through about January 2010, in the Southern District of New York, Koch, willfully and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, participated in multiple interviews in New York, New York, with the U.S. Attorney's Office for the Southern District of New York and the U.S. Postal Inspection Service, in which he made false statements and concealed and covered up facts that were material to the investigation of the sale of Inca stock, specifically, KOCH lied about his knowing participation in the Inca fraud, as charged in Counts One and Two of this Information.

On August 23, 2011, Koch appeared before the Honorable James C. Francis in the Southern District and pleaded guilty to Counts 1, 2 and 3.

Koch's sentencing is currently scheduled for June 6, 2012.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Guidelines. Thus, the sentence to be imposed here is the result of a consideration of:

    (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)   the need for the sentence imposed —

        (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)   to afford adequate deterrence to criminal conduct;

        (C)   to protect the public from further crimes of the defendant; and

        (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

  (3)   the kinds of sentences available;

  (4)   the kinds of sentence and the sentencing range established for —

        (A)   the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

  (5)   any pertinent policy statement . . . [issued by the Sentencing Commission];

  (6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

  (7)   the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not. See Crosby, 397 F.3d at 114-15.

**The Defendant**

The Court adopts the facts set forth in the

7

Presentence Investigation Report ("PSR") with respect to Koch's personal and family history.

**The Offense Conduct**

The following description draws from the PSR. The specific facts of the underlying conduct are adopted as set forth in that report.

As to the offensive conduct in Information 06 CR 902, from at least October 2004 through April 2005, Koch, McAllister and others were engaged in an unlawful scheme to manipulate the demand for and price of common stock of Millennium National Events, Inc. ("Millennium") and other companies. Millennium was a Florida corporation that that owned, organized, promoted and managed mass entertainment events including concerts, sporting events and community festivals, which merged with New Millennium Development Group on January 15, 2004. Koch, McAllister and others planned to defraud the public into buying its stock, in order that McAllister and others could sell substantial quantities of stock they controlled in those companies, at artificially-inflated prices, and earn for themselves thousands of dollars in illegal profits.

More specifically, and as described in more detail below, Koch, McAllister and their co-conspirators defrauded and attempted to defraud the investing public by artificially manipulating the market for the securities of certain publicly-traded companies by, among other things: (i) dominating and controlling the market for the securities of those companies, (ii) corruptly arranging with a registered representative acting as a market maker to post bids and conduct trades that did not relate to actual market demand for the stock of at least one of those companies, with the purpose of creating the false impression of strong market interest in the stock of those companies, (iii) paying and offering to pay bribes to stock promoters and other members of the conspiracy in exchange for their participation in the scheme, (iv) publishing false and misleading press releases portraying those companies as highly successful business entities, and (v) coordinating the timing of those false and misleading press releases with the manipulative trading activity, to further inflate the stock price.

Having pumped, or inflated artificially, the price of the common stock of those companies, through the above

mechanisms, among others, Koch, McAllister and their co-conspirators sold large volumes of shares of those companies on unsuspecting investors at artificially-inflated prices.

McAllister hosted a meeting in October 2004 in South Florida (the "October 2004 Meeting"). Approximately 12 to 15 people attended the October 2004 Meeting, including Koch. At the meeting, McAllister solicited the attendees to help "promote" the stock of Millennium and another company called Inflot Holdings Corp. ("Inflot"), and discussed with Koch and the other attendees the methods by which they could inflate the stock price of Millennium from its then-current trading price of pennies per share, to a price of $1 per share and more. Also at the meeting, McAllister discussed with the attendees paying them, in exchange for contributing their efforts to the conspiracy, with bribes in the form of shares of stock. In response, Koch sought, and on November 12, 2004, ultimately received, large blocks of stock in Millennium and Inflot, for his promised participation. In turn, Koch caused Millennium stock to be transferred to other co-conspirators, including to internet publicity experts (hereinafter, "spammers") as payment for their agreement to send mass e-mailings via the internet to the investing public, for purposes of promoting Millennium's

stock by publicizing false and misleading press releases generated by McAllister.

In about mid-November 2004, Koch, McAllister and their co-conspirators perpetrated various forms of manipulative trading activity in Millennium stock, with the intent rapidly to drive the price of Millennium's stock from $0.06 to $1 and higher, even though there was essentially no actual market demand to support such high prices. As a result of their deceptive and manipulative conduct, on November 17 and 18, 2004, the price of Millennium shares rose sharply, from $0.06 to $1.35, on comparatively heavy trading volume, thereby creating a market capitalization of over $38,000,000 for a company with virtually no assets, a limited operating history, and virtually no current profitability.

Much, if not all, of the purchasing of Millennium stock on November 17 and 18, 2004, was conducted by members of the conspiracy, including several trades by or on behalf of individuals who attended the October 2004 Meeting. These transactions were undertaken not for any legitimate investment purposes, but were, rather, concerted efforts by the members of the conspiracy to create the appearance of real marketplace

demand for Millennium's shares at prices over $1 per share.

Having created the false appearance of strong market interest in Millennium's stock by artificially moving its price over $1, in late 2004 and early 2005, Koch, McAllister and their co-conspirators perpetrated a second phase of the Millennium scheme mounting a campaign to distribute to the public false and misleading "news" stories about the company.

Specifically, Koch, McAllister and their co-conspirators distributed, via mass e-mailings, press releases that falsely portrayed Millennium as a successful event business closely affiliated with several nationally-known and successful media, sports and entertainment entities. The purpose of this media campaign was to exert additional artificial upward pressure on Millennium's stock price. To do so, among other things, Koch, McAllister, and their co-conspirators hired several spammers to disseminate the false and misleading press releases, and paid those spammers by giving them large blocks of shares of Millennium stock. In turn, several spammers hired as part of the conspiracy sent out several waves of millions of e-mails in or about late 2004 and early 2005, including on several days in or about mid-January 2005, containing the false and

12

misleading press releases.

From about late 2004 through about early 2005, Koch, McAllister and their co-conspirators commenced a second wave of various forms of manipulative trading activity in Millennium's stock. This second wave of manipulation was strategically timed in conjunction with the phony press campaign to further bolster the stock price. As a result of this combined effort by McAllister and his conspirators, Millennium's stock price spiked again in January and February 2005.

As with respect to the November 2004 trading activity in Millennium described above, the trading activity in Millennium stock that occurred on January 18 and 19, 2005, involved a large number of trades by individuals who attended, or companies which were represented at the October 2004 Meeting.

Ultimately, the efforts of Koch, McAllister and their co-conspirators to manipulate Millennium's stock price, and widely to disseminate false and misleading information concerning Millennium, lured members of the unsuspecting public into trading in Millennium stock in January and February 2005. These individuals were the victims of the "pump and dump" of

13

Millennium stock. The victims, who were located in various parts of the United States, including the Southern District of New York, made purchases of Millennium shares at prices well above the $0.06 per share price at which Millennium traded prior to November 17, 2004. Several of those victims were defrauded into making purchases of Millennium stock because they were deceived by the waves of e-mails touting Millennium that were disseminated at the direction of McAllister and his co-conspirators.

From the fraud and manipulation of Millennium's stock described herein, the members of the conspiracy obtained fraud proceeds in excess of approximately $281,000.

As to the offensive conduct in Information S1 06 CR 902, from at least October 2006 through in or about July 2008, Koch and others unlawfully manipulated the demand for and price of common stock of Inca Designs, Inc. ("Inca"), a Nevada corporation that designed, produced and sold designer bags, swimwear and resort wear and accessories. These actions would defraud the public into buying its stock, in order that Koch and others could sell substantial quantities of Inca stock they controlled at artificially-inflated prices thereby earning

14

thousands of dollars in illegal profits for themselves.

From at least October 2006 through in or about July 2008, Koch and others unlawfully manipulated the demand for and price of common stock of Inca. These actions would defraud the public into buying its stock, in order that Koch and others could sell substantial quantities of Inca stock they controlled at artificially-inflated prices thereby earning thousands of dollars in illegal profits for themselves.

Inca was a publicly-traded company, whose stock was traded on the Pink Sheets and the Over-the-Counter Bulletin Board. The scheme involved defrauding public investors by artificially manipulating the market for the securities of Inca by, among other things: (i) dominating and/or controlling a large portion of the market for the securities of that company through manipulative trading arrangements including a secret agreement not to sell their shares while deposited at a central brokerage firm; (ii) publishing misleading press releases portraying the company as a highly successful business entity having more lucrative business prospects, more outlets, and less debt than it actually had; and (iii) coordinating the timing of those misleading press releases with the manipulative trading

15

activity, to further inflate the stock price.

Having pumped, or inflated artificially, the price of the common stock of the company through the above mechanisms, Koch and his co-conspirators sold, that is "dumped," large volumes of shares of those companies on unsuspecting investors at artificially-inflated prices.

From the fraud and manipulation of Inca's stock described herein, Koch and his co-conspirators fraudulently obtained proceeds in excess of approximately $2,000,000, of which Koch personally obtained fraud proceeds in excess of approximately $511,759.

In furtherance of the conspiracy Koch and his co-conspirators committed the following overt acts, among others, in the Southern District of New York, and elsewhere: (a) in 2006, KOCH deposited Inca shares at a brokerage firm located in California (the "Brokerage Firm") and held those shares, along with co-conspirators not named as defendants herein, without selling them for an agreed-upon period of time; (b) on August 3, 2007, Koch mailed stock certificates in Inca via Federal Express, from White Plains, New York, to the brokerage firm in

California; (c) on August 8, 2007, Koch mailed stock certificates in Inca via Federal Express, from White Plains, New York, to the brokerage firm in California; (d) on March 20, 2008, co-conspirators not named as defendants herein disseminated false or misleading press releases related to Inca; (e) between March 17 and March 20, 2008, Koch sold 144,000 of his shares in Inca for a total profit of approximately $115,263; and (f) on June 25, 2008, Koch received an e-mail message in Katonah, New York, from a co-conspirator containing false or misleading marketing materials about Inca.

Defense counsel has provided a written statement on behalf of Koch accepting responsibility for his action regarding the Inca scheme.

## The Relevant Statutory Provisions

For Count 1 and 3, the mandatory minimum of imprisonment is a maximum term of imprisonment is 5 years, pursuant to 18 U.S.C. § 371. For Count 2, the maximum term of imprisonment is 20 years, pursuant to 15 U.S.C. §§ 78j(b) and 78ff.

17

For Count 1, 2 and 3, if a sentence of imprisonment is imposed, pursuant to 18 U.S.C. § 3583(b)(2), the Court may impose a term of supervised release of not more than three years.

For Count 1, 2 and 3, the Defendant is eligible for not less than one nor more than five years' probation, pursuant to 18 U.S.C. § 3561(c)(1).

For Count 1 and 3, the maximum fine that may be imposed is $250,000, pursuant to 18 U.S.C. § 3571. For Count 2, the maximum fine that may be imposed is $5,000,000, pursuant to 15 U.S.C. § 78ff. Information 06 CR 902 and Information S1 06 CR 902 have a total of six counts. A special assessment of $100 per count, for a total of $600, is mandatory, pursuant to 18 U.S.C. § 3013.

As a result of committing the offenses alleged in Counts 1 through 3 of Information 06 CR 902 the defendant shall forfeit to the U.S., pursuant to 18 U.S.C. § 1963(a)(1), (a)(2), and (a)(3), all property real and personal, involved in the offense or traceable to such property, including but not limited to a sum of money equal to $350,000.

As a result of committing the offenses alleged in Counts 1 through 3 of Information S1 06 CR 902 the defendant shall forfeit to the U.S., pursuant to 18 U.S.C. § 1963(a)(1), (a)(2), and (a)(3), all property real and personal, involved in the offense or traceable to such property including but not limited to a sum of money equal to $511,759.

Full restitution to the victim is required under 18 U.S.C. §§ 3663A and 3664. Issues regarding the victim and restitution will be presented by the Assistant United States Attorney at the time of sentencing.

**The Guidelines**

The November 1, 2011 edition of the United States Sentencing Commission Guidelines Manual has been used in this case for calculation purposes, pursuant to § 1B1.11(a). The Court finds the following with respect to Defendant's applicable offense level, criminal history, recognition of responsibility, and term of imprisonment:

For Information 06 CR 902 and Information S1 06 CR

902: Count 1 charges the defendant with conspiracy to commit securities, wire and mail fraud in violation of 18 U.S.C. § 371; Count 2 charges securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5; and Count 3 charges conspiracy to commit securities, wire and mail fraud in violation of 18 U.S.C. § 371. Counts 1, 2, and 3 will be grouped together pursuant to 3D1.2(d). Pursuant to §2X1.1(a), the base offense level is the level from the guideline for the substantive offense, plus any adjustment from such guideline for any intended offense conduct that can be established with reasonable certainty. The underlying offenses (securities, mail and wire fraud) are covered by § 2B1.1 of the Guidelines.

The guideline for a violation of 15 USC §§ 78j(b) and 78ff is found in §2B1.1(a). Because the defendant was convicted of an offense referenced to this guideline; and that offense of conviction has a statutory maximum term of imprisonment of 20 years of more, the base offense level is 7 pursuant to §2B1.1(a)(1).

The fraudulent proceeds of the schemes of Information 92 CR 906 and S1 92 CR 906 were $281,000 and $511,759 respectively for a total of $792,759. Section 2B1.1(b)(1)(H)

20

provides that if the loss was more than $400,000, but less than $1,000,000, the offense level is increased 14 levels.

Because the offense involved 10 or more victims, the offense level is increased two levels pursuant to Section 2B1.1(b)(2)(A).

Because the offense involved a violation of securities law and, at the time of the offense, the defendant was a registered broker or dealer; a person associated with a broker or dealer, an investment advisor; or a person associated with an investment adviser, the offense level is increased four levels pursuant to Section 2B1.1(b)(18)(A).

The defendant has been viewed as an organizer, leader, manager as defined in Section 3B1.1(c). As a result, a two-level increase is warranted pursuant to Section 3B1.1.

The defendant willfully obstructed and impeded the administration of justice by making false statements to the United States Attorney's Office and the United States Postal Inspection Service in connection with the investigation of the Inca fraud charges in Information S1 06 CR 902. Pursuant to

Section 3C1.1, a two-level increase is warranted due to obstructive conduct related to (a) the defendant's offense of conviction and any relevant conduct, or (b) closely related offense.

Based on his plea allocution, the Defendant has shown recognition of responsibility for the offense. Because of the defendant's timely notification of his intention to plead guilty, thus allowing the Government to allocate its resources more efficiently, and because the aforementioned base offense level is 16 or greater, pursuant to Section 3E1.1(a) and (b), the offense is reduced three levels.

Accordingly, the applicable offense level is 28.

The Defendant has no known criminal convictions. This warrants zero criminal history points. A total of zero criminal history points establishes a Criminal History Category of I, pursuant to the table at Chapter 5, Part A, of the Guidelines.

Based on a total offense level of 28 and a Criminal History Category of I, the Guidelines range for imprisonment is 78 to 97 months. In the event that the Court finds that the

Defendant meets the criteria pursuant to § 5C1.2, the Court shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence.

The Guideline range for a term of supervised release for Counts 1, 2 and 3 is at least one year but not more than three years, pursuant to §5D1.2(a)(2). The Court shall order a term of supervised release when required by statute (§5D1.1(a)(1)), or except for a deportable alien who is likely to be deported after imprisonment, when a term of imprisonment of more than one year is imposed (§5D1.1(a)(2)). Pursuant to §5D1.1(a), the Court should not ordinarily impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who is likely to be deported after serving a term of imprisonment. In any other case, the Court may order a term of supervised release, pursuant to §5D1.1(b).

Because the applicable guideline range is in Zone D of the Sentencing Table, the Defendant is not eligible for probation, pursuant to §5B1.1, Application Note #2.

The fine range for the instant offense is from $12,500

to $5,000,000 pursuant to §5E1.2(c)(3)(A) and (c)(4). Subject to the defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to §5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,357.01 to be used for imprisonment, a monthly cost of $328.20 for supervision, and a monthly cost of $2,153.22 for community confinement.

Information 06 CR 902 and Information S1 06 CR 902 have a total of six counts. A special assessment of $100 per count is mandatory, pursuant to 18 U.S.C. § 3013 for a total Special Assessment of $600.

Pursuant to Rule 32.2, "[t]he Court must include the forfeiture when orally announcing the sentence or must otherwise ensure that the Defendant knows of the forfeiture at sentencing. The Court must also include the forfeiture order, directly or by reference, in the judgment."

Pursuant to §5E1.1(a)(1), in case of an identifiable victim, the Court shall enter a restitution order for the full

amount of the victim's loss if such order is authorized under 18 U.S.C. § 3663A.

## The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103. In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), and having considered the Guidelines and all of the factors set forth in § 3553(a), it is determined that a Guidelines sentence is warranted in the instant case.

## The Sentence

For the instant offense, Koch will be sentenced to 78 months' imprisonment.

A special assessment of $600, $100 for each count, payable to the United States, is mandatory and shall be due immediately.

Because the Defendant has no assets, no fine is imposed.

Pursuant to the Violent Crime Control and Law Enforcement Act of 1994, for offenses committed after September 13, 1994, the court shall require that all offenders on probation, parole, or supervised release submit to one drug test within fifteen days of commencement of probation, parole or supervised release and at least two drug tests thereafter for use of a controlled substance, unless ameliorated or suspended by the court due to its determination that the defendant poses a low risk of future substance abuse as provided in 18 U.S.C. §§ 3563 (a)(5) and 3583 (d).

The defendant shall make restitution to victims identified by the government, in an amount to be provided by the government. The Court may choose to delay issuing an Order of Restitution for up to 90 days after sentence in anticipation of

receiving the necessary identifying information from the Government pursuant to the provisions of 18 U.S.C. § 3664(d)(5). The restitution shall be paid in monthly installments of 10% of gross monthly income over a period of supervision to commence 30 days after the date of the judgment or the release from custody if imprisonment is imposed. If the defendant is engaged in a BOP non-UNICOR work program, the defendant shall pay $25 per quarter toward the criminal financial penalties. However, if the defendant participates in the BOP's UNICOR program as a grade 1 through 4, the defendant shall pay 50% of his monthly UNICOR earnings toward the criminal financial penalties, consistent with BOP regulations at 28 C.F.R. § 545.11. The factors in 18 U.S.C. § 3664(f)(2) were considered in formulating the payment schedule.

The defendant shall forfeit the defendant's interest in property to the United States in accordance with the Forfeiture provisions of Information 06 CR 902 and S1 06 CR 902.

The defendant is viewed as a good candidate for voluntary surrender. He has kept all court appearances and has been in compliance with all terms and conditions of his pretrial release. He is not viewed as a flight risk or a danger to the

community.

The terms of this sentence are subject to modification
at the sentencing hearing scheduled for June 6, 2012.

It is so ordered.

New York, NY
May 4, 2012

_____
ROBERT W. SWEET
U.S.D.J.